UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
S.M. & L.M., individually and on behalf of    :
J.M.,    :
               Plaintiffs,    :
   :      **OPINION AND ORDER**
v.    :
   :      24 CV 9273 (VB)
EASTCHESTER UNION FREE SCHOOL    :
DISTRICT,    :
               Defendant.    :
-------------------------------------------------------------x

Briccetti, J.:

Plaintiffs S.M. and L.M. (the "Parents") are the parents of J.M., a child with a disability

as defined by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq.

("IDEA").  The Parents bring this action, individually and on behalf of J.M., against the

Eastchester Union Free School District (the "District") pursuant to the IDEA.

The Parents seek reversal of a decision of the New York State Education Department

state review officer ("SRO").  The SRO found, over the Parents' objections, that the District had

offered J.M a free appropriate public education ("FAPE") for the 2023–2024 school year

(eleventh grade), thereby reversing the impartial hearing officer's ("IHO") decision to the

contrary, and overturning the IHO's award of tuition reimbursement to the Parents.  The District

seeks to uphold the SRO's decision.

Now pending are the parties' cross-motions for summary judgment.  (Docs. ##17, 18-1).

For the reasons set forth below, the Parents' motion is DENIED and the District's motion

is GRANTED.  The SRO's decision is AFFIRMED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I.      Statutory Framework

The IDEA was enacted to promote the education of disabled children.  20 U.S.C. § 1400(d)(1)(A); Bd. Of Educ. of the Hendrick Hudson Cent. Sch. Dist. V. Rowley, 458 U.S. 176, 179 (1982).[1]  The IDEA requires states receiving federal funds to provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  Public school districts must provide "special education and related services tailored to meet the unique needs of a particular child, [which are] reasonably calculated to enable the child to receive educational benefits."  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children with disabilities residing in the State" to determine whether they require special education and related services.  20 U.S.C. § 1412(a)(3)(A); Handberry v. Thompson, 446 F.3d 335, 347 (2d Cir. 2006).  Children with disabilities must be reevaluated at least once every three years, but not more than once a year, unless the parent and evaluating public agency agree otherwise.  34 C.F.R. § 300.303.

The IDEA requires states to create an individualized education program ("IEP") for each disabled student.  20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP for each handicapped child.").  The IEP is a "comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to

---

[1]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

meet those needs." Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).

In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education ("CSE"). See N.Y. Educ. Law § 4402(1)(b)(1); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative," as well as others with special knowledge or expertise about the student. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175; N.Y. Educ. Law § 4402(1)(b)(1)(a). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175.

The IDEA requires a school district to send prior written notice to a child's parents when the school district proposes, or refuses, to initiate or change "the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to the child." 20 U.S.C. § 1415(b)(3). If the parents believe the state failed to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school from the local board of education. See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369–70, 374. The parents must provide notice ten business days before removing the child from the public school. 20 U.S.C. § 1412(a)(10)(C)(iii).

Parents seeking such reimbursement must then file a "due process complaint" challenging the appropriateness of the IEP. FB v. N.Y.C. Dep't of Educ., 923 F. Supp. 2d 570, 577 (S.D.N.Y. 2013). A school district must respond within ten days of receiving the complaint, unless the school district has already sent prior written notice to the parent regarding the subject

3

matter of the due process complaint.  20 U.S.C. § 1415(c)(2)(B)(i)(I); 34 C.F.R. § 300.508(e).

The school district's response must address the issues raised in the complaint and include

specific information outlined in 20 U.S.C. § 1415(c)(2)(B)(i).

Separately, a school district must convene a resolution meeting within fifteen days of

receiving notice of the parents' due process complaint.  20 U.S.C. § 1415(f)(1)(B)(i); 34 C.F.R.

§ 300.510(a)(1).  "The purpose of the meeting is for the parent of the child to discuss the due

process complaint, and the facts that form the basis of the due process complaint, so that the

[school district] has the opportunity to resolve the [underlying] dispute."  34 C.F.R. §

300.510(a)(2).  The school district has thirty days from receipt of the complaint to "resolve[] the

complaint to the satisfaction of the parents."  20 U.S.C. § 1415(f)(1)(B)(ii).  If the parties resolve

the complaint, they must execute a legally binding agreement, signed by the parents and a school

district representative, setting forth the resolution.  20 U.S.C. § 1415(f)(1)(B)(iii).  If the parties

fail to resolve the complaint, they may proceed with a due process hearing.  20 U.S.C. §

1415(f)(1)(B)(ii).

An IHO appointed by the school district conducts the due process hearing on the parents'

complaint.  See N.Y. Educ. Law § 4404(1).  The IHO's decision may be appealed to an SRO at

the State Education Department.  See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g).

The SRO's decision may then be challenged in federal court.  20 U.S.C. § 1415(i)(2)(A).

A public school district is required to reimburse parents for private educational services

if:  (i) the district fails to establish the student's IEP provided a FAPE; (ii) the parents establish

the unilateral placement selected by the parents was appropriate; and (iii) equitable

considerations favor the parents' claim.  Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12–

16 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013).

II.     Factual Background

The parties have submitted briefs, statements and counterstatements of fact pursuant to

Local Civil Rule 56.1, and the administrative record and exhibits from the IHO and SRO

proceedings,[2] which reflect the following factual background.[3]

J.M. is a student with disabilities as defined by the IDEA.

J.M. attended District schools beginning at least in fall 2015, when he was in third grade,

through the 2020–2021 school year, when he was in eighth grade.  Throughout that time, J.M.

participated in annual New York State Education Department assessments, for proficiency in

English, Science, and Math.  According to these assessments, J.M. achieved proficiency only

once: in his fourth grade science assessment.

In the eighth grade, J.M. participated in the triennial reevaluations the District is required

to conduct for students with disabilities.  34 C.F.R. § 300.303.  The District's evaluations showed

J.M. struggled in reading fluency and comprehension, visual-spatial awareness and processing

speeds, as well as in adaptive and interpersonal communications.  In addition, in the spring of his

eighth grade year, on or around April 21, 2021, J.M. underwent a private neuro/psycho

educational evaluation at the Parents' request.  This private evaluation was conducted by Drs.

---

[2]     The Parents' motion for summary judgment is filed at (Doc. #17) with an accompanying memorandum of law at (Doc. #19).  The District's motion is filed at (Doc. #18-1), with an accompanying memorandum of law at (Doc. #18-2), and a reply in support at (Doc. #18).  As a result, the District's filings appear on the docket as a "Reply Memorandum of Law."  (Doc. #18).  The parties' joint Rule 56.1 statement is filed at (Doc. #18-3).

[3]     Citations to the "IHO Decision" refer to the IHO's Findings of Fact, Conclusions of Law and Decision, dated May 4, 2024.  (Doc. #14 at ECF 42–91).  Citations to the "SRO Decision" refer to the SRO's Decision, dated August 7, 2024.  (Id. at ECF 9–40).  "ECF —" refers to page numbers automatically assigned by the Court's Electronic Case Filing System.  Although the parties filed only a redacted record to the docket (Docs. ##14, 15), the Court received an unredacted hard copy of these materials and considered the unredacted version in ruling on the parties' cross-motions for summary judgment.  The unredacted version will be filed under seal.

Stephanie O'Leary and Laura Wert-Snyder ("2021 O'Leary Report").  Although the 2021

O'Leary Report echoed many of the findings in the District's triennial evaluation, it also

highlighted J.M.'s anxiety, depression, and difficulties navigating social dynamics with peers.

The 2021 O'Leary Report determined J.M. required an IEP designed to address his

"executive functioning deficits" to ensure he could "consistently access his educational

opportunities."  (Doc. #18-3 "56.1" at ¶ 13).  Specifically, the 2021 O'Leary Report

recommended J.M. attend daily, one-on-one executive functioning sessions with a teacher, as

well as small classes with no more than 10 other students, all of whom should have "similar

profiles in terms of cognitive capacity and learning needs" as J.M.  (Id.).  Moreover, the 2021

O'Leary Report "recommended that out of district placements" be considered in the event the

District could not provide such a program.  (Id.).

A.    2021–2022 and 2022–2023 School Years

The Parents enrolled J.M. in Winston Preparatory School ("Winston"), in Norwalk,

Connecticut, for the 2021–2022 school year, when he was in ninth grade.  Winston is a private

school for students with learning disabilities, which prioritizes small class sizes and one-on-one

student teacher time.  Pursuant to a settlement agreement between the parties, J.M attended

Winston for both ninth and tenth grade (the 2021–2022 and 2022–2023 school years,

respectively), and the District reimbursed the Parents for J.M.'s tuition.  (Doc. #14 at ECF 198).

By the end of the 2022–2023 school year, J.M.'s standardized testing scores no longer met the

criteria for a diagnosis of a learning disability in certain subjects and his progress reports noted

he made "noticeable gains as he matured socially, academically, and emotionally."

On June 7, 2023, a CSE was convened to develop J.M.'s IEP for the 2023–2024 school

year.  The CSE was chaired by Gianna Fleischman, the District's psychologist, and attended by

6

one of the Parents, several representatives from the District, and certain representatives from Winston.[4] At the CSE, representatives from Winston testified to J.M.'s "tremendous growth" over the course of his two years at their school and highlighted areas in which J.M. continued to experience challenges. (Doc. #14-5 at ECF 55). The parent expressed her belief J.M. had improved in certain subjects due to the "individualized help" he was receiving at Winston, although she noted J.M. continued to struggle with "social skills and executive functioning skills." (Id. at ECF 56). The CSE discussed J.M.'s goals and the special education services which could be provided by the District upon J.M.'s return to a District school. (Id.).

Ultimately, the CSE recommended J.M. be placed at Eastchester High School in the Special Education Program for the 2023–2024 school year (eleventh grade). (Doc. #14-5 at ECF 56). The CSE's proposed IEP specified J.M. should: (i) be given access to a "resource room" for forty-minutes a day; (ii) attend classes with a 15:1 student to teacher ratio; (iii) attend thirty-minute speech language therapy ("SLT") sessions twice a week in small-groups with 5:1 student to teacher ratio; (iv) have daily access to the District's flexible support program ("FSP"); (v) attend weekly thirty-minute individual counseling sessions; (vi) attend weekly thirty-minute small group counseling sessions; (vii) attend special reading instruction for forty-minutes every other day; and (viii) have an accelerated triennial reevaluation in August 2023, permitting his IEP to be revised if necessary. (Id.).

---

[4]     The District representatives included: the CSE chairperson/psychologist, a District consultant, a District Special Education teacher, a District general education teacher, the District's occupational therapist, a District speech/language therapist, and a District counselor. (56.1 at ¶ 35). In addition, the Dean of Winston and a Winston general education teacher attended. (Id.).

On July 6, 2023, the Parents emailed Fleischman, providing formal notice of their intent to place J.M. at Winston for the 2023–2024 school year and seek tuition reimbursement from the District due to its failure to provide J.M. a FAPE.  (Doc. #14 at ECF 340).  Nevertheless, on August 24, 2023, the District's Board of Education Review for Special Education notified the Parents of its support for the CSE's recommended IEP for J.M. along with placement in a District school.  (Doc. #14-5 at ECF 72).

On September 6, 2023, at the Parents' request, J.M. sat for another round of testing by Drs. O'Leary and Wert-Snyder.  The subsequent report ("2023 O'Leary Report") showed J.M.'s reading skills, executive functioning, anxiety, and depression had improved since he sat for the tests underlying the 2021 O'Leary Report.  Inferring Winston to be the driver of J.M.'s improvement, the 2023 O'Leary Report recommended J.M. "continue to access the individualized education and targeted executive functioning skills training he has received at Winston[.]"  (56.1 at ¶ 33).

J.M. attended Winston for the 2023–2024 school year.

III.    Procedural Background

    A.    IHO Hearing and Decision

On December 12, 2023, the Parents filed a Due Process Complaint, triggering the IHO review process.  (Doc. #14 at ECF 197–208).  The Due Process Complaint asked the IHO to find that, for the 2023–2024 school year: (i) the District denied J.M. a FAPE, (ii) the Parents were impeded from participating in the decision-making process for the District's proposed IEP, (iii) the District was required to reimburse the Parents the cost of tuition for J.M.'s placement at Winston, and (iv) the District was required to pay the Parents' attorneys' fees and expenses.  (Id. at ECF 208).

IHO Steven P. Forbes presided over four hearings, spanning January 22 through February 28, 2024 (the "IHO Hearing").  Nine witnesses testified during the IHO Hearing, including one of the Parents; Dr. O'Leary; the Dean of Students at Winston, Eric Fischman; the Assistant Superintendent for the District, Dr. Gregory Stowell; and the CSE's chairperson, Gianna Fleischman.  On May 4, 2024, the IHO Decision concluded the District failed to offer J.M. a FAPE for the 2023–2024 school year and directed the "New York City Department of Education"[5] to "fund the cost of [J.M.'s] 2023–2024 placement at Winston in the amount of $78,250.00," either directly or by reimbursing the Parents.  (Doc. #14 at ECF 88, 91).

The IHO determined J.M. was denied a FAPE because the District's proposed IEP was predetermined and failed to consider J.M.'s current needs.  The IHO noted "[a] common theme among the witnesses who testified for the District was that they neither had any firsthand knowledge of [J.M.] nor did they make a good faith effort to acquire such knowledge."  (Doc #14 at ECF 79).  The IHO explained "the District's failure to conduct" basic assessments of J.M. "left the IEP team at a considerable disadvantage in terms of creating an appropriate program for [J.M.] given that all of the information that the District had about [J.M.] from [its] own evaluations was completely out of date."  (Id.).

Moreover, the IHO described Fleischman's testimony on the subject of the District's outdated information about J.M. as "perplexing if not astonishing."  (Doc #14 at ECF 79).  During the IHO Hearing, Fleischman admitted to conducting no evaluations of J.M. prior to developing the IEP, but said the District would eventually evaluate J.M. after the IEP was in place "to determine whether [J.M.'s] program needed to be 'tweaked' or adjusted" to fit his

---

[5]    For purposes of ruling on the instant motion, the Court construes the IHO's reference here to the "New York City Department of Education" as a reference to the District.

needs.  (Id.).  The IHO thus concluded "it very much seemed that the District had a predetermined program in mind for [J.M.], and were determined to make [J.M.] fit their program rather than the other way around."  (Id. at ECF 80).  As a result, the IHO concluded the District had "completely inverted the processes required of them by the IDEA."  (Id.).

Although the IHO acknowledged "the IEP offered [J.M.] access to a number of related services, accommodations and resources that were at least intended to assist him with self-regulation, organization, attentional issues and academics"—all issues with which J.M. struggled—the IHO determined it was "far less clear" whether the IEP was appropriate for J.M. specifically, given the District's failure to base the IEP on an in-person evaluation of J.M. or on J.M.'s most recent test results.  (Doc #14 at ECF 81).  Moreover, the IHO took issue with the District's method of addressing J.M.'s needs.  For example, Dr. O'Leary and the Parents believed J.M. required daily SLT, intensive 1:1 support from teachers, and small class sizes (meaning fewer than ten students per class).  Yet the District's IEP recommended J.M. receive only two, thirty-minute SLT sessions per week; access to the FSP on an as-needed basis; small-group counseling; and classes of fifteen students.  (Id. at ECF 82–83).  In further support of its belief that the District had improperly predetermined J.M.'s IEP, the IHO pointed to Fleischman's testimony in the IHO Hearing that she did not believe J.M. made any progress at Winston.  The IHO called this testimony "not the least bit credible" because J.M.'s records indicated he had made significant progress while at Winston.  (Id. at ECF 81).

After finding the District failed to provide J.M. with access to a FAPE, the IHO determined the Parents' unilateral placement of J.M. at Winston for the 2023–2024 school year was appropriate.  (Doc. #14 at ECF 87).  Crucially, because J.M. "demonstrat[ed] consistent progress across a broad array of subjects" at Winston and "the District did not meaningfully

10

contest the appropriateness of the unilateral placement" or offer evidence contravening the record "that the Parent[s] cooperated with all of the District's efforts to develop an IEP," the IHO ordered the District to fully reimburse the Parents for the cost of J.M.'s placement at Winston in the 2023–2024 school year.  (Id. at ECF 87–90).

The IHO did not otherwise address the Parents' argument that the IEP was procedurally inadequate because the Parents had been denied the opportunity to meaningfully participate in the decision-making process for the District's proposed IEP.

B.    SRO Review

On June 12, 2024, the District appealed the IHO's decision to the SRO, challenging the IHO's findings that (i) the District failed to meet its burden of proving the 2023–2024 IEP provided J.M. with a FAPE and (ii) the Parents demonstrated Winston was an appropriate unilateral placement for J.M.  (Doc. #14 at ECF 100–10).  The Parents answered and opposed the District's appeal.  On August 7, 2024, SRO Justyn P. Bates issued a decision reversing the IHO.  (Doc. #14 at ECF 9–40).

The SRO Decision first addressed "the IHO's alleged credibility findings."  (Doc. #14 at ECF 22).  Although the SRO Decision acknowledged that deference is due to IHO credibility findings unless non-testimonial evidence or the hearing record "compels a contrary conclusion," the SRO determined no such deference was due here.  (Id. at ECF 22–23).  This was mainly because "a review of the IHO's decision . . . do[es] not support a conclusion that the IHO made credibility findings" at all.  (Id.).  Instead, the SRO characterized the IHO as having merely "dr[awn] attention to conflicting and confusing testimonial evidence elicited at the [IHO Hearing]."  (Id. at ECF 23).  The SRO explained that any agreements or disagreements "with the IHO's findings of fact" in the SRO Decision were "based on the weight accorded to the

evidence, not the credibility of the witnesses' testimony" because "the IHO did not make any specific credibility findings." (Id.).

Next, the SRO addressed the IHO's conclusion that the District failed to provide J.M. with a FAPE because (i) his IEP was predetermined and (ii) his most recent testing results were not considered in creating his IEP. (Doc. #14 at ECF 23–29). The SRO reversed the IHO's finding of predetermination. According to the SRO, the IHO failed to consider the appropriate inquiry with respect to predetermination, which is "whether the CSE had the requisite open mindedness with regard to the contents of the IEP." (Id. at ECF 24). Because both the Parents and representatives from Winston participated in the CSE meeting, the SRO determined the IEP was not predetermined. Indeed, the SRO explained "the Parents' active participation at the June 2023 CSE meeting . . . necessarily defeats any claim that the June 2023 CSE predetermined the contents of [J.M.'s] IEP." (Id.).

Moreover, the SRO found the District's failure to reevaluate J.M. prior to the creation of the IEP was not improper because such evaluations are required only once every three years, and J.M. had last been evaluated by the district two and a half years before the CSE meeting. (Doc. #14 at ECF 25). Thus, the SRO determined "the IHO's conclusions that the district evaluations of [J.M.] were 'completely out of date' . . . was error." (Id.). The SRO also described the IHO's reliance on the District's lack of familiarity with J.M. as "error" because "it was unrealistic to expect the district staff to have greater familiarity" with J.M. given his placement at Winston in the two years prior to the CSE meeting. (Id. at ECF 26–27).

The SRO further explained "the evidence in the hearing record support[ed] a finding that the June 2023 CSE had sufficient evaluative information upon which to develop [J.M.'s] IEP." (Doc. #14 at ECF 25). For instance, the SRO noted the CSE had relied upon educational and

psychological evaluations from 2020 and 2021, as well as input from the Parents, Dr. O'Leary, and individuals from Winston, while creating the IEP.  (Id. at ECF 26).  Although the SRO acknowledged a CSE was required to consider independent educational evaluations, such as the 2021 and 2023 O'Leary Reports, the SRO explained "consideration does not require substantive discussion" by the CSE.  (Id. at ECF 27).  Nor, according to the SRO, does it require "that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight or adopt their recommendation."  (Id.).

The SRO next discussed the District's contention that the IHO had "ignored the District's [least restrictive environment ("LRE")] mandate."  (Doc. #14 at ECF 29).  The SRO agreed with the District and determined the evidence demonstrated the District adequately considered the need to provide J.M. with necessary "supportive specialized environments" while "factor[ing] in [the] appropriate level of access to nondisabled peers in a general educational setting."  (Id. at ECF 35).  The SRO also addressed the IHO's findings that the District "ignored" J.M.'s needs for SLT and individualized counseling, including the IHO determination that the FSP was an insufficient replacement for the level of individualized care J.M. received at Winston.  (Id. at ECF 35–39).  The SRO explained that the Parents' belief that Winston was the best environment for J.M. did not make it "necessary for the District to recreate that precise environment in order to offer [J.M.] a FAPE."  (Id. at ECF 39).

Finally, the SRO Decision overturned the IHO's finding that Winston was an appropriate placement for J.M. as "not necessary" because, having overturned the IHO's decision to the contrary, the SRO found the District provided J.M. with a FAPE for the 2023–2024 school year. (Doc. #14 at ECF 40).

On December 5, 2024, the Parents challenged the SRO Decision by filing a complaint in this Court.

**DISCUSSION**

I.      Standard of Review

In federal court, parties seeking review of administrative decisions in cases brought under the IDEA usually do so by motion for summary judgment.  See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  However, unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion.  Id.  Rather, summary judgment in an IDEA case functions as an appeal from an administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).

In this context, the Court: (i) reviews the record of the administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).

"[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007). The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

"[T]he deference owed to an SRO's decision depends on the quality of that opinion." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189.  "Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater

14

familiarity with the evidence and the witnesses than the reviewing court."  Id.  The Second

Circuit's approach requires district courts to consider the following:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded
> more weight than determinations concerning whether the IEP was developed
> according to the proper procedures.  Decisions involving a dispute over an
> appropriate educational methodology should be afforded more deference than
> determinations concerning whether there have been objective indications of
> progress.  Determinations grounded in thorough and logical reasoning should be
> provided more deference than decisions that are not.  And the district court should
> afford more deference when its review is based entirely on the same evidence as
> that before the SRO than when the district court has before it additional evidence
> that was not considered by the state agency.

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244.

Under such deferential review, "[w]here the IHO and SRO disagree," the Court "defer[s]

to the reasoned conclusions of the SRO as the final state administrative determination."  C.F. ex

rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014).  "However, where the SRO's

determinations are insufficiently reasoned to merit deference, the courts should defer to the

IHO's analysis."  Id.

Accordingly, a district court "must defer to the SRO's decision[s] on matters requiring

educational expertise unless it concludes that the decision was inadequately reasoned, in which

case a better-reasoned IHO opinion may be considered instead."  R.E. v. N.Y.C. Dep't of Educ.,

694 F.3d at 189.  The "IDEA's statutory scheme requires substantial deference to state

administrative bodies on matters of educational policy," and district court review of such

decisions is "by no means an invitation to the courts to substitute their own notions of sound

educational policy for those of the school authorities which they review."  Cerra v. Pawling Cent.

Sch. Dist., 427 F.3d 186, 191–92 (2d Cir. 2005).

Ultimately, "federal courts reviewing administrative decisions must give due weight to

these proceedings, mindful that the judiciary generally lacks the specialized knowledge and

experience necessary to resolve persistent and difficult questions of educational policy." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 240.  Courts may not "make subjective credibility assessments," or "choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence."  Id.

II.      Tuition Reimbursement

Claims for tuition reimbursement are "governed by the Burlington/Carter Test, which looks to (1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."  C.F. ex rel R.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 76; see generally Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369; Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. at 12.  The school district has the burden of proving its IEP offered the student a FAPE. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 184 (citing N.Y. Educ. Law § 4401(1)(c)).  If the district "fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them."  Id. at 185.

III.     Adequacy of an IEP

To decide whether an IEP is adequate under the IDEA, courts follow a two-part test.  See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206–07 (1982). First, courts examine the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA."  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190.  Not all procedural violations render an IEP inadequate, however.  Id.  Instead, an IEP is procedurally inadequate only if the violations, individually or cumulatively, "impeded the child's right to a

16

FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." Id.

Second, courts examine the substantive adequacy of the IEP to determine whether "an IEP [is] reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 386, 399 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id. (emphasis in original). "The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." Id. Still, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199. "[C]hallenges to a school district's proposed placement school must be evaluated prospectively (i.e., at the time of the parents' placement decision) and cannot be based on mere speculation." M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 244 (2d Cir. 2015).

Moreover, "[b]ecause the law expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122 (quoting 20 U.S.C. § 1412(a)(5)(A)).

Because every child is unique, "determining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed., 546 F.3d 111, 113 (2d Cir. 2008). "Pursuant to that test, a court should consider, first, whether education in the regular classroom, with the use of supplemental aids and

services, can be achieved satisfactorily for a given child, and, if not, then whether the school has mainstreamed the child to the maximum extent appropriate." Id. at 120. "Only when the nature or severity of a child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily should a child be segregated." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122 (quoting 20 U.S.C. § 1412).

IV.    Application

The Parents contend the IEP for the 2023–2024 school year failed to provide J.M. with a FAPE because it was substantively and procedurally inadequate. (Doc. #19 at 16–17). Moreover, they contend the SRO Decision was not well reasoned or supported by a preponderance of the evidence and is thus not entitled to the full scope of judicial deference. (Id. at 24). They urge the Court to overturn the SRO Decision and reinstate the IHO Decision. (Id. at 22).

The District, on the other hand, says the Court should defer to the SRO and affirm the SRO Decision finding for the District because it is well-reasoned, thorough, and supported by a preponderance of evidence in the record. (Doc. #18). The District argues the Court is obligated to defer to the SRO Decision by the applicable standard of review. (Doc. #18-2 at 10).

The Court agrees with the District.

A.    Procedural Adequacy

The Parents argue the IEP was procedurally defective because (i) it was based on outdated evaluative data; (ii) it was predetermined; and (iii) the Parents' participation in the CSE was formalistic. (Doc. #19 at 13–20). The Court disagrees.

As an initial matter, "[p]rocedural flaws do not automatically require a finding of a denial of a FAPE." Carillo v. Carranza, 2021 WL 4137663, at *11 (S.D.N.Y. Sept. 10, 2021). Indeed,

18

only procedural defects which "individually or cumulatively result in the loss o[f] educational opportunity or seriously infringe on a parent's participation" in the creation of the IEP constitute the denial of a FAPE.  Id.  Because procedural matters such as "predetermination [are] not [ones] requiring educational expertise . . . a lesser degree of deference is owed to the SRO on th[ese] issue[s] than is due on a more squarely educational issue, like whether a FAPE is substantively appropriate."  G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at *11 (S.D.N.Y. Aug. 10, 2020).

### 1.    Evaluative Data

"A public agency," such as the District, "must ensure that a reevaluation of each child with a disability is conducted" if (i) "the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation," (ii) "the child's parent or teacher requests a reevaluation," or (iii) it has been three years since the last evaluation unless the parent and public agency agree a reevaluation is unnecessary.  34 C.F.R. §300.303.

There is no evidence in the record that either the Parents or any of J.M.'s teachers requested the District conduct an early reevaluation of J.M.  Nor is there any dispute that, when the CSE was convened in June 2023, it had not yet been three years since J.M.'s last evaluation. J.M. sat for mandatory, triennial testing sometime in the fall of his eighth grade year, the 2020– 2021 school year.  He was thus not due for mandatory triennial testing until Fall of 2023, months after the CSE was convened.

Nevertheless, the Parents argue J.M.'s progress at Winston was so significant it warranted an early reevaluation to develop an adequate IEP.  (Doc. #19 at 14–15).  This argument is unavailing because, as the SRO explained, the CSE did not rely solely on the results of J.M.'s

fall 2020 triennial evaluation when developing the IEP.  Instead, the CSE relied on a bevy of evaluative data, including at least:  an occupational therapy evaluation from March 2021, a neuropsychological evaluation from April 2021, a speech/language evaluation from April 2021, a February 2023 letter from J.M.'s private therapist, as well as a report card and teacher progress summary from June 2023, in addition to input from the Parents, Dr. O'Leary, and representatives from Winston at the CSE meeting.  (Doc. #14 at ECF 58).

J.M. undoubtedly made progress at Winston.  The CSE had the benefit of recent wide-ranging progress reports and testimony from a variety of specialists, teachers, and the Parents themselves, showing this progress.  Thus, "the Court concludes that no additional evaluations or tests were necessary to render the IEP development process procedurally compliant."  L.B. N.Y.C. Dep't of Educ., 2016 WL 5404654, at *11 (S.D.N.Y. Sept. 27, 2016).

2.    Predetermination

"It is well settled that consideration of possible recommendations for a student prior to a CSE meeting is not prohibited, as long as the CSE understands that changes may occur at the meeting."  Carillo v. Carranza, 2021 WL 4137663, at *11.  The Parents' out of circuit case law to the contrary is non-binding and unavailing.  (Doc. #19 at 17).  "In fact, districts may arrive at the CSE meeting with pre-formed ideas about the best course of action for the child.  The key factor . . . is whether the CSE has an open mind as to the contents of the student's IEP."  Carillo v. Carranza, 2021 WL 4137663, at *11.

The Parents cite Fleischman's IHO Hearing testimony as proof the CSE lacked the requisite "open-mindedness" when developing J.M.'s IEP.  (Doc. #19 at 18).  Fleischman testified she did "not believe that any evaluation would have changed [her] program recommendations or services" although she acknowledged fresh evaluations of J.M. "might have

adjusted goals." (Doc. #14-5 at ECF 287).  But the cited testimony does not provide the full picture.  Shortly thereafter, Fleischman testified it was her "wholehearted belief, that [the CSE] had an accurate picture of [J.M.] and [his] weaknesses and [his] deficits."  (Id. at ECF 288).  Fleischman said she felt the CSE "had enough information based on [J.M.'s prior testing] and based on everything that Winston Prep shared with [the CSE]."  (Id. at ECF 290).

Contrary to the Parents' contention, Fleischman's testimony—viewed holistically—does not suggest the District sought to fit J.M. into its preferred program instead of creating an IEP to suit J.M.'s individual needs.  Rather, it suggests District representatives at the CSE, such as Fleischman, based their programming recommendations on their review of J.M.'s prior testing results, along with the materials provided by Winston regarding his progress over the prior two years.  An IEP based on a review of J.M.'s particular test results and recent progress reports can hardly be said to have been developed the wrong way around.  Viewed in this light, Fleischman's testimony that she did not expect new testing results to change her programming recommendations suggests she came into the CSE prepared, not close-minded.

Moreover, "the record actually suggests that it was the parents, not the District, who lacked an open mind."  Carillo v. Carranza, 2021 WL 4137663, at *12.  The Parents' belief that the IEP was not adequately suited to J.M. appears to turn on the CSE's failure to either place J.M. at Winston or otherwise recreate the precise conditions of Winston at a District school.  For instance, the Parents argue the IEP cut J.M.'s "individualized help to 30 minutes per week despite the parents' acknowledgement that the individualized help J.M. received for a full period daily . . . at Winston" benefitted him.  (Doc. #19 at 17).  Similarly, the Parents decry the IEP for placing J.M. "in classes more than 50% larger than those he has benefitted from at Winston."  (Id.).  But the CSE's failure to place J.M. at Winston or to adopt Winston's precise methods and

21

accommodations, in particular after reviewing J.M.'s testing results and progress reports, does not mean the IEP was predetermined.  Nor does it render the IEP procedurally defective.

In addition, courts "regularly reject claims of predetermination where the record reflects active and meaningful participation by the student's parents in the formulation of the IEP." G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at *11.  Here, the Parents undeniably participated in the CSE meeting.  However, they contend their participation was a formality because the CSE did not seriously consider their input.  (Doc. #19 at 16).

Although the Parents are correct that a CSE must be "willing to listen to the parents and to give them an opportunity to object" to the proposals in the IEP, "the fact that the CSE decides on a course that differs from the parents' wishes does not amount to denial of meaningful participation by the parents." Carillo v. Carranza, 2021 WL 4137663, at *11.  The Parents admit in their brief that "[c]omments made by [J.M.'s] current teachers" from Winston, "as well as those from the parent" during the CSE meeting were included in his IEP documents.  (Doc. #19 at 19).  The Parents, however, felt this level of participation was inadequate, because the CSE did not discuss continuing J.M.'s placement at Winston.  (Id.).   In fact, the Parents argue that the CSE's failure to discuss placing J.M. at Winston despite "testimony and data proving his current program was benefitting him" along with the Parents' description of J.M.'s "growth since attending Winston" amounted to a deprivation of their right to participate in the decisionmaking process.  (Id.).

Yet "courts in this Circuit have uniformly held that the CSE is not required to consider non-public placements after it determines that a public placement is available that has the ability to implement" the IEP. G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at *12.  "Thus, once the CSE determined that the District's [proposed placement] was an appropriate

22

placement and was the least restrictive environment under which [J.M.] could be educated, it was not required to consider any more restrictive placement" such as Winston. Id. Even so, the Parents cite an out of circuit case, Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 83–84 (3d Cir. 1999), in support of their contention that "parents are not subject to the same mainstreaming requirements as a school board" and therefore are not prohibited from considering private placements which are more restrictive than public ones. (Doc. #19 at 19).

But Warren G. pertains to whether a parent's choice of private placement is subject to an LRE requirement to qualify for tuition reimbursement after a determination that a district failed to provide a FAPE in the form of an appropriate IEP. Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d at 83–84. It does not stand for the general proposition that a CSE is required to consider a parent's preferred private placement option after determining that a suitable public placement exists. Nor does it stand for the proposition that parents are deprived of the ability meaningfully to participate in decision making relating to their child's IEP absent such consideration.

Therefore, the Court finds the SRO properly found by a preponderance of the evidence that the IEP was procedurally adequate.

B.    Substantive Adequacy

When, as here, an IHO and SRO disagree, the Court should defer to the SRO Decision unless it is poorly reasoned. C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014). Deference is required "on matters requiring educational expertise" such as whether an IEP is substantively adequate. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189.

An IEP is substantively adequate when it is (i) "likely to produce progress and tailored to the unique needs of the child" and (ii) "offered in the least restrictive environment." G.S. v.

Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at \*11.  Although an IEP "must aim to enable the child to make progress" Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. at 399, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199.  Instead, the relevant inquiry is "whether the IEP is reasonable, not whether the court regards it as ideal." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. at 399 (emphasis in original).  In addition, the LRE requirement "expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at \*11.

The Parents contend the IEP was substantively inadequate because "mainstreaming" J.M.—meaning placing him in an environment with nondisabled peers—amounted to denying him a FAPE and, in any event, anything less than the individualized accommodations J.M. received at Winston was unlikely to produce progress, thereby also denying him a FAPE.  (See generally Doc. #19).  Moreover, the Parents assert the SRO Decision was poorly reasoned and failed to defer to the IHO's credibility findings.  (Id.).

The District disagrees on all counts.  According to the District, "the IHO ignored the District's LRE mandate" and, taking that mandate into account, the IEP provided J.M. with sufficient accommodations to ensure his access to a FAPE.  (Doc. #18-2 at 4–5).

At the outset, the Court notes the SRO Decision is well-reasoned and detailed throughout, including in its discussion of the IEP's substantive adequacy.  The Parents' arguments to the contrary amount to no more than repeatedly asserting the IHO Decision was well-reasoned and, as such, should not have been overturned by the SRO.  (See Doc. #19 at 22, 24).  But the inquiry

here is not, bypassing the SRO Decision, whether the Court believes the IHO Decision was well-reasoned or defensible.  Instead, on matters of substantive educational policy, such as the adequacy of the educational programming prescribed by an IEP, the Court must determine whether the SRO Decision is persuasive and well-reasoned.  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189.  If it is, the SRO Decision merits the Court's deference, even though it overturns the IHO Decision.  C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014).

The Court concludes the substantive adequacy of the IEP is supported by a preponderance of the evidence in the record.

> ### 1.    IHO Credibility Determinations

The Parents claim the SRO improperly dismissed the IHO's credibility determinations. (Doc. #19 at 20).  The District restates, without offering evidence or argument, the SRO's contention the IHO did not make credibility findings, "but rather, drew attention to conflicting and confusing testimonial evidence elicited at the Impartial Hearing."  (Doc. #18-2 at 1).

In general, SROs need not accord deference to IHO credibility findings when "non-testimonial, extrinsic evidence justifies a contrary conclusion."  P.G. ex rel. D.G. v. City Sch. Dist. of N.Y., 2015 WL 787008, at *16 (S.D.N.Y. Feb. 25, 2015).  The SRO states the IHO made no "specific credibility findings."  (Doc. #14 at ECF 23).  Based on the Court's review of the record, however, the IHO did make at least one specific credibility finding.  The IHO called Fleischman's testimony that she did not believe J.M. made any progress at Winston "not the least bit credible."  (Doc. #14 at ECF 81).  To the extent the SRO Decision found this was not a credibility determination, the Court disagrees.  However, the IHO's description of Fleischman's testimony is inaccurate and, in any event, not dispositive.

Fleischman described the testimony of the Winston representatives and the Parents at the CSE, explaining J.M. had "made tremendous growth, especially as of most recent months, that academically, he has made a lot of progress." (Doc. #14-5 at ECF 192). Later, when asked why the CSE had departed from Dr. O'Leary's recommendation that J.M. be placed away from nondisabled peers, Fleischman explained J.M. had "struggled socially and emotionally with dysregulation while he was" in the District and was still "struggling with social and emotional dysregulation" at Winston. (Id. at ECF 247). Because "he is in two placements performing the same" Fleischman explained she "would not recommend such a restrictive environment to get the same results." (Id.). When pressed on whether J.M.'s social-emotional results changed, Fleischman testified "I didn't say [J.M.'s results] didn't change, but he is still struggling." (Id. at ECF 248). When she was asked again whether it was her "understanding" that J.M. "had made no gains in the area of social-emotional or behavioral well-being while at Winston," Fleischman disagreed, stating "I'm not saying that. I'm saying he continues to struggle in the area of social-emotional issues." (Id.) And when asked to acknowledge J.M. had made gains at Winston, she did so, noting "that's what the school reported." (Id. at ECF 249).

The IHO may not have found this testimony credible, but the Court finds the IHO's description of it to be inaccurate. Far from a blanket assertion that J.M. made no progress at Winston, Fleischman repeatedly stated J.M.'s continuing struggle to regulate emotionally led her to conclude an environment as restrictive as Winston was not a worthwhile trade-off. Regardless, the SRO's Decision does not rest on Fleischman's purported belief that J.M. made no progress at Winston. Whether Fleischman believed J.M. made progress at Winston is not even particularly material to the relevant inquiries, which are whether the IEP was (i) "likely to produce progress and tailored" to J.M.'s unique needs, and (ii) "offered in the least restrictive

26

environment."  G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at *11.  For the reasons described herein, both these requirements are met.  The Parents point to no credibility findings by the IHO that bear on these inquiries or necessitate a contrary conclusion.

        2.      Mainstreaming

"The law expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122; 20 U.S.C. § 1412(a)(5)(A).  Although a "flexible, fact-specific analysis" should be applied, the proper LRE inquiry is "whether the school has mainstreamed the child to the maximum extent appropriate."  P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ., 546 F.3d at 113, 120.  Thus, a child should only be separated from nondisabled peers "when the nature or severity of a child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122 (quoting 20 U.S.C. § 1412).

The Parents nevertheless contend J.M. was denied a FAPE because the IEP "mainstreamed" him by placing him among non-disabled peers.  In support, they point to Dr. O'Leary's testimony at the Impartial Hearing.  (Doc. #19 at 22–23).  When asked how important it was for J.M. to "have access to peers without disabilities," Dr. O'Leary explained it was "not only not a priority" but "a risk" for J.M. to have such access based on his "socio-emotional presentation."  (Id. at 23).  Dr. O'Leary thus concluded that, for J.M., "being educated not among peers with similar profiles but with, kind of a general population, c[ould] be a detriment."  (Id.).

In addition, the Parents point to J.M.'s poor performance in District schools prior to his placement at Winston.  (Doc. #19 at 23).  This is not only unpersuasive, but it also fails to consider J.M.'s two years of development and progress at Winston.  Although, as discussed, the

Parents contend the CSE failed to take J.M.'s progress into consideration when developing the IEP, the Parents' aversion to placing J.M. among nondisabled peers appears to be rooted in outdated experience, not on J.M.'s current capacity, as reflected by the evaluative data reviewed by the CSE.

The SRO Decision explained that, based on the information available to the CSE, "it was reasonable for the CSE to provide [J.M.] with access to his nondisabled peers in classes where he was stronger academically and then provide [a] resource room in a 5:1 ratio" as well as SLT and specialized reading instruction every other day "to supplement [J.M.'s] instruction in the general education environment as necessary in the event that social emotional dysregulation" occurred. (Doc. #14 at ECF 32).  Therefore, the SRO determined the IEP "balanced the need for appropriately supportive instruction in specialized classes that were individualized to [J.M.'s] needs while also providing some of his education alongside his nondisabled peers to the maximum extent appropriate."  (Id. at ECF 32–33).  The Court agrees.  Moreover, the SRO Decision correctly points out that the IHO "failed to conduct an analysis of [the IEP] in terms of the IDEA's mandate to place [J.M.] with nondisabled peers to the maximum extent appropriate, even if that was not viewed as ideal by the parents or the private experts."  (Id. at ECF 33).

As explained in the SRO Decision, the record is clear that, while developing the IEP, the CSE considered J.M.'s evaluations and progress at Winston as well as the District's obligation under the IDEA to educate him in the least restrictive environment possible.  Accordingly, the CSE developed an IEP that placed J.M. in a mix of class-sizes, some of which would occur among his non-disabled peers.  Nothing in the Parents' brief persuades the Court that, by adhering to its statutory LRE requirement, the District necessarily denied J.M. a FAPE.

28

3.    Likely to Produce Progress

An IEP must be both "likely to produce progress and tailored to the unique needs of the child" in question.  G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at *11.  The SRO determined the IEP here met both requirements.  The Court agrees.

The Parents' claim that the IEP's other accommodations for J.M. were "inadequa[te] to meet J.M.'s needs" is unpersuasive.  (Doc. #19 at 24).  In support, the Parents cite the IHO Decision, which claimed District representatives failed to "offer[] anything resembling a rational explanation as to how FSP, which is primarily offered on an as needed basis . . . could even compare to the level of support offered by the Focus program" at Winston, which provided daily one-on-one support to J.M.  (Id.).  Likewise, the Parents assert "J.M.'s unique needs" meant "he needed a continuation of the supports provided at Winston (e.g., 1:1 daily executive functioning supports, access to peers with similar learning profiles, intentional cap on class sizes) to be able to access his educational opportunities."  (Id.).  But this is not the standard.

The District is not required to provide "every special service necessary to maximize [J.M.'s] potential" in order to provide him a FAPE.  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199.  As the SRO explained, although "the parents may believe that the setting at Winston Prep was the best environment for [J.M.] for the 2023–24 school year, it was not necessary for the District to recreate that precise environment in order to offer [J.M.] a FAPE."  (Doc. #14 at ECF 39).

The SRO Decision carefully canvassed the record for J.M.'s areas of weakness, his goals, and whether the accommodations provided in the IEP with respect to J.M.'s classroom sizes, SLT, and counseling services, adequately addressed his needs.  (Doc. #14 at ECF 29–39).  Ultimately, the SRO determined that "the June 2023 CSE addressed [J.M.'s] needs in an

29

individualized manner and his IEP was reasonably calculated to enable the student to receive educational benefits in light of his circumstances." (Id. at ECF 39).

Accordingly, affording due weight to the SRO Decision, and based on the Court's independent examination of the record, the Court concludes the District's recommended IEP for the 2023–2024 school year were reasonably calculated to allow J.M. access to educational benefits in the least restrictive environment, and therefore provided J.M. a FAPE.

C.    Reimbursement

Because the District offered J.M. a FAPE for the 2023–2024 school year, the Court need not reach the question of whether the Parents' enrollment of J.M. at Winston was appropriate or whether equitable considerations support their tuition reimbursement claim. See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d. Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.").

**CONCLUSION**

The Parents' motion for summary judgment is DENIED. The District's motion for summary judgment is GRANTED.

Accordingly, the SRO's decision is AFFIRMED and the complaint is DISMISSED.

The Clerk is instructed to terminate the pending motion (Doc. #17) and close this case.

Dated:  February 12, 2026
      White Plains, NY

                SO ORDERED:

                Vincent L. Briccetti
                United States District Judge